## Von Cannon v. Philadelphia Transportation Company, Appellant.

Argued October 14, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES and HIRT, JJ.

*Jay B. Leopold,* with him *Bernard J. O'Connell,* for appellant.

*Herbert Welty,* with him *Samuel T. Kaplan,* for appellee.

OPINION BY CUNNINGHAM, J., April 14, 1942:

Woodland Avenue, a north and south highway in Delaware County, crosses at right angles Baltimore Pike (U. S. Route No. 1), running east and west. The paved portion of Woodland Avenue is 20 feet wide and the roadway of Baltimore Pike is 36 feet in width, but by reason of rounded corners each street is somewhat wider as it opens into the intersection; there is a down grade on Baltimore Pike from the west into the intersection. Traffic was controlled at this intersection by automatic lights at each corner which changed from green through amber to red and from red through amber back to green. In addition, there was a sign at the top of the hill warning eastbound travel of traffic lights ahead.

About noon on July 30, 1940, a clear summer day, a two-door Oldsmobile sedan, owned by June Von Cannon, the wife-plaintiff below and appellee herein, and driven by her brother-in-law, Watkins Von Cannon, and in which she sat beside him on the right side of the front seat, was driven eastwardly on Baltimore Pike past an amber light into the intersection, at a rate of speed testified by appellee to have been somewhere between 30 and 15 miles per hour, and crashed against the rear right side of appellant's bus proceeding southwardly on Woodland Avenue through the intersection.

The entire front of appellee's car was crushed in (as shown by a photograph placed in evidence by her) and she also sustained serious personal injuries. The cost of repairing her car was $400.

Appellee and her husband, William Von Cannon, brought their joint action in trespass against the appellant company, alleging that its bus driver, who had stopped on the north side of the intersection by reason of a red light against him, negligently started through the intersection on the amber light without waiting for the green light for north and southbound traffic on Woodland Avenue. The husband-plaintiff did not appear at the trial; appellee testified he had deserted her subsequent to the accident and she had been obliged to pay her own medical and surgical expenses; a verdict was properly directed in favor of appellant as against him.

The trial judge submitted to the jury the issues of the negligence of appellant's driver and the alleged contributory negligence of the driver of appellee's car; and also the question whether the driver of her car was her agent. The jury returned a verdict in favor of appellee in the sum of $1500; appellant's motions for judgment n. o. v., based upon its point for binding instructions, or a new trial were both denied; this appeal from the judgment entered upon the verdict followed.

Under the assignments of error and appellant's statement of questions involved, the negligence of the driver of its bus may be assumed. Appellee testified she was unable to locate her brother-in-law and secure his attendance at the trial. The only testimony, therefore, upon appellee's side of the case, relative to the circumstances preceding and attendant upon the accident, was that of appellee herself.

The questions with which we are now confronted are: (1) Whether, under appellee's own testimony, the manner in which the driver of her car approached and entered the intersection contributed so clearly to the

accident as to require an instruction by the trial judge that he had been guilty of contributory negligence as a matter of law; and (2) If so, whether his negligence was imputable to her as a matter of law.

When well established principles of law are properly applied to the facts appearing from appellee's own testimony, we think both of the above stated questions should have been decided, as matters of law, against appellee and appellant's point for binding instructions in its favor affirmed.

1. The rules of law by which drivers of motor vehicles entering an intersection protected by traffic signals must govern themselves were clearly and forcefully laid down by Mr. Justice DREW in *Byrne et al. v. Schultz, (Stone et al. Aplnts.),* 306 Pa. 427, 431, 433, 160 A. 125, in which opinion a number of earlier cases are cited and discussed. At page 431 it is said, quoting from *Gilles v. Leas,* 282 Pa. 318, 127 A. 774: "We have held over and over again that at street crossings drivers must be exceedingly vigilant to have their cars under such control that they may stop at the slightest sign of danger. If they do not, and an accident results, they are liable in damages for its consequences. . . . . . . "

The opinion continues, (p. 433) : "The law only makes obligatory the rule of common sense regarding the duty of a driver at the intersection of streets, where traffic is very dangerous because conflicting. He must be vigilant, must exercise a high degree of care, must have his car under complete control, and must look, and see what is visible, before attempting to cross the intersecting street. This duty has not been relaxed by the introduction of traffic officers and signals, both of which are intended to facilitate traffic and render crossings less dangerous. The driver has the help of the officer or mechanical device, but cannot dispense with due care on his part by relying on them solely. He is still bound to the same degree of care as before the

introduction of these modern aids to travel. He must recognize them, and obey them, but he cannot use them under any circumstances to eliminate the exercise of due care on his part. The signal to cross is not a 'command to go, but a qualified permission,' and the qualification is 'to proceed lawfully and carefully,' as a prudent man would under the circumstances, which certainly requires looking to the right and left before entering upon the intersecting street. To hold otherwise, and as contended by defendants, would be to relieve drivers from vigilance and careful driving at street intersections, and license them to drive blindly where traffic is most dangerous. It would greatly increase the peril of street crossings for both pedestrians and motorists. It is for this reason that we would emphasize the fact that so far as the degree of care required of motorists or other drivers at street intersections is concerned, there has been no change in the law of negligence by the introduction of traffic officers and signals. The law is the greatest preventative of accidents, as is shown by the fact that when observed few accidents happen, and the protection it gives should not be lessened or destroyed by variations and refinements which add perils to travel by taking away necessary security."

Appellee's description of the incidents immediately preceding and leading up to the accident was as follows: "A. Well, we were coming along Baltimore Pike going east. There is sort of a steep grade. So, we proceeded on and I noticed to the right as we approached the intersection at Woodland Avenue, that the traffic light on my right was green. To my left was a large bus, standing on the other side of the pike, standing still. We proceeded on down this hill about 40 miles an hour and got to about 150 feet from the intersection and slowed down to approximately 30 miles an hour. When we were about three or four car lengths from the intersection, the bus on the left started to go right across, and at the same instant the light changed

from green to yellow—caution. Well, I felt the brakes go on the car, and the bus still kept on coming. My brother-in-law swerved the car slightly to the right to go with the bus, but of course there wasn't any space or time in which to stop it, and the right—I mean the left front of my car collided with the right center of the bus."

A question and answer upon her redirect examination read: "Q. At that time, that is, at the time of the collision, what in your judgment was the speed at which your automobile was moving? A. Well, naturally we must have slowed down considerably, to about, I should say, 15 miles an hour after the brakes were applied."

She further testified that when she first saw the bus it was "standing" and "the light was still green" for her car. The next time she noticed the bus it was about "three or four car lengths" away, at which time "the light started turning yellow or amber." As to the location of the bus, she said it had proceeded to a point "more than halfway across" the intersection, but she later estimated that distance as "at least two-thirds across the pike" and as "away beyond the center." After referring to separate occasions upon which she saw the bus she testified, "There wasn't any time that [she] didn't have it in view" from the first time she saw it until the accident. Appellee admitted she had seen the warning sign at the top of the hill.

It seems to us that the only inference which can reasonably be drawn from appellee's version of the accident is that the speed at which her brother-in-law approached the intersection, and his consequent inability to stop before crashing into the bus, was a contributing cause of the accident.

Viewing the testimony in the light most favorable to appellee, and in the absence of any direct testimony upon the point, it may be assumed that the driver of her car looked to the right and left as he approached the intersection. If he did, he must have seen the bus com-

ing into the intersection; appellee says she saw it well within the intersection. If he did not look he was grossly negligent. Assuming that the driver of appellee's car performed the duty incumbent upon him of looking both ways for traffic on Woodland Avenue, the necessary inference is that, in disregard of the warning sign at the top of the hill, he came down the grade on Baltimore Pike at such a high rate of speed that it was impossible for him to stop when the signal light for Baltimore Pike changed. By reason of his failure to have appellee's car under such control that he could stop in obedience to the amber signal, and particularly as he must have seen, if he looked, the bus coming through the intersection, the collision was inevitable. As remarked by HIRT, J., in the recent case of *Hess v. Mumma et al.*, 144 Pa. Superior Ct. 313, 316, 19 A. 2d 524, "One who looks but cannot stop is in no better position than one who, though able to stop, drives blindly into the intersection without looking. Both are equally negligent."

The contention of counsel for appellee that the driver of her car had a right, under the provisions of Section 1026 of the Vehicle Code, as amended June 5, 1937, 75 PS §635, to proceed through the intersection on the amber light is without merit. It reads: (b) 2. "Yellow, When Shown Alone.—Traffic facing the signal shall stop before entering the nearest crosswalk at the intersection, but if such stop cannot be made in safety, a vehicle may be driven *cautiously* through the intersection." (Italics supplied.)

Whatever situations may have been within the contemplation of the legislature in making this amendment to the code, it was certainly not intended to authorize a driver to pass an amber light at the rate of speed admitted by appellee and proceed into an intersection already occupied, according to her testimony, by a vehicle proceeding upon the cross street. There was nothing *cautious* about the manner in which her brother-in-law approached and entered this intersection.

On the whole, appellee's testimony presents a clear case of her driver failing to conform with the standards of care fixed by the settled law relating to and defining the duties of drivers of automobiles at street intersections.

2. We think it equally clear, under appellee's own testimony, that at the time of the accident the legal situation existing between her and the driver of her car was that of master and servant, or at least, principal and agent—not bailor and bailee, as contended by her counsel; and that the trial judge should have so declared as a matter of law.

The accident happened during a journey beginning at Cary, North Carolina, where appellee formerly lived and operated a restaurant, with New York as its intended destination. The circumstances under which the trip began, and continued up to the time of the collision, were thus related by appellee: "Why, my husband and brother-in-law wanted to go to New York to see if they could not get a position because it was the dull season of the year down there, and they asked me if they could take my car. My husband often drove it. *He* asked me if *he* could take my car to drive he and his brother to New York to look for a position there during the dull season, and I said that *he* could. So, after the arrangements were made, and they were going, they suggested that as long as it was dull down there, why didn't I take the trip with them, so I consented." (Italics supplied.) She then stated that her brother-in-law drove the car for the entire trip and explained her husband's departure from the party in Virginia the day before the accident in the following manner: "Well, we stopped at South Hill, Virginia, and there is a bus terminal there and we wanted to get something to eat, and he (her husband) was so anxious to get on to New York in a hurry regarding the position, that he said he would go on ahead, and I could drive as I

wanted to, leisurely, up to the city and make a few stops. And we (appellee and her brother-in-law) stopped the first night in Alexandria, Virginia, and then I wanted to make a stop in Philadelphia to visit some friends here."

Under these facts whatever bailment there may have been in this case was a bailment to appellee's husband, which definitely terminated at South Hill, Virginia, when he took a bus for New York. From that point on, her testimony brings her case directly within the authority of *McMahen v. White*, 30 Pa. Superior Ct. 169, where the circumstances were similar to those here present, with the exception that the vehicle there involved was horse drawn. In that case the owner and his guest were riding in a carriage drawn by one horse. At the request of the guest the owner permitted her to drive; the issue was whether the owner, as principal, was liable for injuries inflicted in a collision with another horse and vehicle proceeding in the opposite direction caused by the negligent driving of the guest. It was pointed out in the course of the opinion, by RICE, P. J., that where the owner himself is not negligent the relation of master and servant, or principal and agent, as distinguished from the relation of bailor and bailee, must actually exist at the time in order to hold the owner liable. It is also stated that the mere fact that the driver as well as the owner who is riding in the vehicle has an interest personal to himself in reaching the destination will not relieve the owner from responsibility to third persons. A paragraph from the opinion reads:

"A somewhat extended examination of authorities bearing upon the question warrants us in saying that they generally agree, that the real elements at the foundation of responsibility to third parties of the person sought to be charged as master, in a case like the present, for the negligent manner in which the service rendered for him was performed, are the right to select

the. person. who is to render the service, and the right to control his action while so doing. As has been declared in numerous cases, he must not only have the right to select the servant or agent, but to direct the mode of performance, and to so control him in his acts in the course of his rendition of the service as to prevent injury .to others."

After a discussion of the applicable principles this conclusion was reached (p. 178) : "Applying these principles to the case in hand we are quite clear that the facts testified to by the defendant established the relation between him and the driver which made him responsible to third parties for her negligent management of the vehicle."

In the case at bar, appellee would have been liable, in our opinion, for any injuries sustained by a nonnegligent third person through the negligent operation of her car by her brother-in-law. This is the test upon the question whether her brother-in-law's negligence is imputable to appellee. As set forth "Restatement of the Law of Torts," Vol. II, Section 485, she is barred from recovery because of the negligence of her brother-in-law "if, but only if, the relation between them [was] such that [appellee] would be liable as defendant for harm caused to others by [the] negligent conduct of [her brother-in-law]."

·· Here, appellee had at all times the right to refuse her brother-in-law permission to continue driving her car and had the right to direct the manner in which he should drive and to so control his driving as to prevent injuries to herself or others.

In. *Bell v. Jacobs*, 261 Pa. 204, 104 A. 587, the owner of an automobile, in order to ascertain what repairs to it were necessary, permitted a mechanic to sit beside him and drive the car. Upon the issue of the owner's liability for fatal injuries to a third person through the negligent driving of the mechanic, our Supreme Court said:

"It was defendant's car and he acquiesced in what Fink, (the mechanic) who was acting for him, did, and cannot be excused because he was not personally at the wheel. A man out riding in his car is not relieved from responsibility for its management because, with his permission, another is acting as driver; and this is especially so where the owner tacitly assents to the manner in which the car is driven. *There is a presumption, not here rebutted, that an owner present in his car has power to control it.*" (Italics supplied.)

Nor was that presumption rebutted in the present case. Appellee's testimony shows she tacitly consented to the manner in which her brother-in-law operated her car. An excerpt from her testimony reads: "Q. Did you say anything to your brother-in-law who was driving the car, at any time prior—A. No, sir. Q. (Continued)—to the accident, that is, from the time that you came in sight of the intersection until the accident occurred? A. I didn't say anything to him. I would not say anything to anybody who was driving a car ...... Q. Did you say anything to your brother-in-law after you came over the hill? A. No, because I don't believe in talking to anybody who is driving a car. In other words, Your Honor, I am not a back seat driver. I drive a car myself, and I would not rattle him." See also *Spegele v. Blumfield,* 120 Pa. Superior Ct. 231, 182 A. 149.

The cases cited and relied upon by counsel for appellee are clearly distinguishable. *Rodgers v. Saxton,* 305 Pa. 479, 158 A. 166, and the other cases cited, are all cases in which the relationship between the owner of the car and its driver was that of husband and wife. Such cases are clearly recognized in "Restatement of the Law of Torts" as an exception to the general rule. Section 486 reads: "A master is barred from recovery against a negligent defendant by the contributory negligence of his servant acting within the scope of his employment," and Section 487 continues: "The contribu-

342

tory negligence of husband or wife does not bar the other spouse from recovery for his or her own bodily harm."

The remaining question is whether upon this record as it stood at the conclusion of the testimony the trial judge should have held that the contributory negligence of appellee's driver was imputable to her as a matter of law. Here, as in *McMahen v. White,* supra, there was no dispute with relation to the circumstances under which appellee placed her brother-in-law in control of the operation of her car after her husband had taken the bus to New York from South Hill, Virginia. Her testimony definitely shows he was driving it in the capacity of her agent or servant. It was expressly held in that case, (p. 176), that where there is no dispute concerning "the conditions under which the parties were acting" the question of the owner's "responsibility for the conduct of the driver of his vehicle" is one of law.

In the cases cited in the opinion of the court below, as authority for submitting this issue to the jury, both the agency and its scope were in dispute and depended upon debatable inferences from controverted circumstances. We have nothing of that kind upon this record.

Our conclusion is that the learned trial judge erred in refusing appellant's point for binding instructions and denying its subsequent motion for judgment n. o v.

Judgment reversed and here entered for appellant.